FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2015 MAR 31  PM 12: 04

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

RJ MACHINE COMPANY, INC.,
**Plaintiff,**

-vs-

Case No.  A-13-CA-579-SS

CANADA PIPELINE ACCESSORIES CO. LTD.,
**Defendant.**

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Canada Pipeline Accessories Co. Ltd. (CPA)'s Motion for Summary Judgment [#79], Plaintiff RJ Machine Company, Inc. (RJ Machine)'s Response [#81], CPA's Reply and Motion to Strike [#95], RJ Machine's Response to Motion to Strike [#98], CPA's Reply in Support of Motion to Strike [#99], and the parties' Joint Motion Requesting Bench Trial [#101]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders DENYING the motion for summary judgment.

### Background

**I.      Procedural History**

Plaintiff RJ Machine desires to sell a certain type of "flow conditioner" product and to call its product by the name "50E."  Defendant CPA, which owns a registered trademark in the word "50E," opposes RJ Machine's efforts to call its products by that name and has threatened enforcement of its trademark rights in the event RJ Machine proceeds to market using CPA's mark.

In response, RJ Machine filed the instant declaratory judgment action, seeking, among other things, a finding by the Court that CPA's registered mark is not protectable under trademark law.

In basic terms, a "flow conditioner" is a perforated metal plate used in pressurized pipelines to assist in the measurement of the flow of fluids (liquid or gas). The holes in the plates can vary in number, size, and arrangement, but the goal is to manipulate fluid flow conditions to achieve accurate metering. CPA sells a particular type of flow conditioner at issue in this case, which it calls the 50E, and CPA has been selling the 50E since approximately 1999 under the leadership of Blaine and Dale Sawchuk. Mot. Summ. J. [#79-1] Ex. 1 (Sawchuk Decl.) ¶ 3.

The Sawchuk brothers previously worked for a company called NOVA before starting CPA in 1997. *Id.* While working for NOVA, they became familiar with a prototype flow conditioner developed and tested internally by NOVA. *Id.* A researcher named Umesh Karnik had performed the testing and labeled the prototype the "NOVA50-E" in a paper he wrote in 1995 (the Karnik Paper). *Id.* After starting CPA, the Sawchuks obtained permission from NOVA to make the NOVA50-E commercially available. At least part of the technology underlying the NOVA50-E was also covered by a patent (the Laws Patent), so in order to sell the prototype, CPA obtained a license from an entity called StatoilHydro ASA for the right to use the design disclosed by the Laws Patent. *Id.*

CPA then began manufacturing, marketing, and selling what it branded the "CPA 50E" or "50E" in 1999. *Id.* During this exclusive license period, CPA registered two trademarks with the United States Patent and Trademark Office (PTO): (1) the word mark "CPA 50E" in 2005 (U.S. Trademark Registration No. 2,994,138); and (2) the word mark "50E" in 2011 (U.S. Trademark Registration No. 3,934,642). *See* Compl. [##1-4, -3] Exs. D, C. On March 6, 2012, the Laws Patent

expired, and CPA, as the licensee of the patent, no longer had the exclusive right to sell the flow conditioner described in the patent.

After expiration of the patent, RJ Machine decided it wanted to compete with CPA. In order to do so, RJ Machine concluded it needed to call its flow conditioner the "50E" because, according to RJ Machine, that is what consumers now call this particular flow conditioner. RJ Machine, however, was aware of CPA's opposition to any entrants into the market who were using its trademarks. Specifically, RJ Machine claims CPA had sued a company called Canalta Controls Ltd., which had apparently tried to market and sell a flow conditioner similar in design to CPA's 50E and call it the "50E." According to RJ Machine, CPA asserted trademark infringement as well as trade dress infringement, arguing the design of its 50E flow conditioner comprises non-functional, distinctive, and protectable trade dress. *See* Compl. [#1] ¶¶ 29–30; Reply [#95] ¶ 6 (describing CPA's policing of its marks post-expiration of the Laws Patent through opposition to Canalta and RJ Machine).

RJ Machine, wanting to enter the market like Canalta Controls but not wanting to be sued by CPA, petitioned the PTO to cancel the "50E" and "CPA-50E" trademark registrations. *See* Compl. [#1] ¶ 31. CPA requested the PTO suspend RJ Machine's cancellation action while the lawsuit against Canalta Controls is pending, a request the PTO apparently granted. *Id.* ¶ 32. Given the suspension, RJ Machine approached CPA, seeking assurances CPA would not try to prevent RJ Machine from marketing flow conditioners using the 50E design and designation. *Id.* ¶ 33. RJ Machine presented CPA's counsel with proposed marketing material which compared RJ Machine's product directly with CPA's. *Id.* ¶ 34, 24. Counsel for CPA responded in a letter indicating CPA would sue RJ Machine if RJ Machine advertised or marketed its 50E flow conditioners using the

same design as CPA's 50E flow conditioner or used the term "50E" to identify its flow conditioner. *Id.* [#1-5] Ex. E.

On July 10, 2013, RJ Machine filed this lawsuit against CPA, alleging the following four counts: (1) violations of 15 U.S.C. § 2 (Sherman Act), (2) violations of the Texas Free Enterprise and Antitrust Act of 1983, (3) unfair competition and unfair trade practices, and asking for (4) a declaratory judgment. *Id.* [#1] ¶¶ 41–64. The Court granted CPA's motion to dismiss counts (1)–(3), leaving only the declaratory judgment action. *See* Order of Nov. 22, 2013 [#35]. Specifically, RJ Machine seeks a declaration: (1) the term "50E" is generic; (2) the design of the 50E is taught by the Laws Patent and/or the Karnick Paper; (3) the 50E trade dress claimed by CPA is functional and non-distinctive; (4) neither the term "50E" nor the 50E trade dress claimed by CPA have become distinctive of CPA's flow conditioners in commerce; and (5) continued registration of U.S. Trademark Registration Nos. 3,934,642 ("50E") and 2,994,138 ("CPA 50E") without a disclaimer of "50E" is "inconsistent with RJ Machine's and others' right to use '50E' generically and/or descriptively." Compl. [#1] ¶¶ 58–64. In its "Prayer for Relief," RJ Machine added the following requested declarations: (6) the sale and marketing of flow conditioners labeled "50E" and/or with the 50E design taught in the Laws Patent and/or the Karnick Paper does not constitute: (a) trademark infringement or counterfeiting under 15 U.S.C. § 1114 or any state law, (b) trademark dilution under 15 U.S.C. § 1125 or any state law, (c) a false representation under 15 U.S.C. § 1125, or (d) unfair competition under any state law or the common law. *Id.* at 10–11. Finally, RJ Machine seeks an order cancelling CPA's trademark registrations in "50E" and "CPA-50E." *Id.* at 11.

CPA filed an answer and also asserted a number of counterclaims. *See* Answer & Countercl. [#36]. Subsequently, CPA filed an Amended Answer in which it removed all of its counterclaims.

*See* Am. Answer [#77].  Therefore, the only live claim in this case is RJ Machine's declaratory judgment action.

## II.   CPA's Motion for Summary Judgment

CPA has now filed a motion for summary judgment.  CPA's basic argument is it has used its trademarks for fifteen years and, before expiration of the Laws Patent, developed customer recognition of CPA's brand name.  Mot. Summ. J. [#79] at 1.  According to CPA, to allow RJ Machine to call its imitation flow conditioner "50E" would rob CPA of benefits earned by fifteen years of promotion and marketing, would confuse customers, and would deprive customers of the ability to associate the well-known "50E" trademark with its recognized source: CPA.  *Id.*

CPA argues its trademarks do not qualify as "generic" or "descriptive without secondary meaning."  Instead, its marks are distinctive to CPA because CPA, and CPA alone, has spent time and resources selling flow conditioners under the "50E" brand, creating a significance in the mind of relevant consumers to associate the "50E" marks with flow conditioners sold by CPA.  *Id.*  The two trademarks at issue were unopposed, creating a presumption of validity (a presumption that, as to "CPA-50E," is incontestable because it was sold in the market for five years post-registration).  *Id.*  CPA argues these marks are fanciful and do not describe or refer generally to flow conditioners.  *Id.*  As such, CPA seeks dismissal of RJ's declaratory judgment claim.  *Id.*

## III.   RJ Machine's Response

RJ Machine responds that CPA is attempting to exploit fraudulently acquired trademarks in order to prevent RJ Machine from competing in the market.  Resp. [#81] at 1.  According to RJ Machine, the name "50E," rather than being a source identifier for CPA, is actually the name for a particular type of flow conditioner with a specific set of technical characteristics.  *Id.* at 2.  RJ

Machine contends the name "50E," which derives from the original prototype, the "NOVA50-E," is based on two factors. First, the "50" refers to a 50% solidity of the plate. *Id.* at 3. Second, the Karnick Paper described various hole designs labeled A–G (i.e., NOVA50-A, NOVA50-B, etc.) that were tested, and "E" or "NOVA50-E" was the fifth design. *Id.* RJ Machine contends the fact "50E" describes a type of flow conditioner means the mark is generic and not distinctive to CPA. *Id.* at 2.

To combat CPA's assertion of presumptions of validity of its trademarks, RJ Machine argues CPA withheld information regarding the nature, origin, and source of the trademarks from the PTO, and without this knowledge of the technical, descriptive nature of the name or the actual owner of the name and product, the PTO registered both marks. *Id.* According to RJ Machine, the omission of material information during the registration of the marks overcomes the presumption of their validity. *Id.*

Finally, RJ Machine argues the validity of a trademark can come into question post-registration if there is a lack of quality control in the manufacturing, which results in an inconsistent product. *Id.* RJ Machine contends CPA has failed to exercise quality control over its 50E flow conditioners. As a result, RJ Machine argues CPA's registered trademarks have ceased to function as trademarks and have become generic. *Id.*

## Analysis

### I.   Legal Standards

### A.   Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp.*

-6-

*v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant

and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## B.   Legally Protectable Trademarks

Trademark infringement is governed by the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. §§ 1051 *et seq.* There are two elements to a successful infringement claim under the Lanham Act. The plaintiff must first "establish ownership in a legally protectible mark, and second, . . . show infringement by a demonstrating a likelihood of confusion." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010) (citations omitted). The instant case does not involve the typical scenario where a plaintiff trademark holder sues an alleged infringer. Instead it involves a declaratory judgment in which the plaintiff, who is the potential infringer, seeks to show the defendant's registered trademarks "50E" and "CPA 50E" are invalid. If the marks are invalid, then the plaintiff's use of the marks does not amount to infringement. Therefore, the only issue in the present case is the threshold question of whether CPA's marks are legally protectable.

The Lanham Act defines a "trademark" as

> any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods [or services] . . . from those manufactured or sold [or provided] by others and to indicate the source of the goods [or services], even if that source is unknown.

15 U.S.C. § 1127.

"To be protectable, a mark must be distinctive . . . ." *Amazing Spaces*, 608 F.3d at 237 (citations omitted). The Supreme Court has explained a mark can be distinctive by either (1) being

inherently distinctive because the mark's "intrinsic nature serves to identify a particular source," or

(2) having acquired distinctiveness if it has developed secondary meaning, which occurs when, "in

the minds of the public, the primary significance of a [mark] is to identify the source of the product

rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11

(2000) (citations omitted). "In the context of word marks, courts have applied the now-classic test

originally formulated by Judge Friendly" in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537

F.2d 4 (2d Cir. 1976). *Id.* In his test, Judge Friendly created categories of marks existing across the

distinctiveness spectrum. The Fifth Circuit has summarized the *Abercrombie* categories as follows:

> A *generic* term is the name of a particular genus or class of which an individual article or service is but a member. A generic term connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product. Generic terms can never attain trademark protection. Furthermore, if at any time a registered trademark becomes generic as to a particular product or service, the mark's registration is subject to cancellation. Such terms as aspirin and cellophane have been held generic and therefore unprotectable as trademarks.

> A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients. Descriptive terms ordinarily are not protectable as trademarks; they may become valid marks, however, by acquiring secondary meaning in the minds of the consuming public. Examples of descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services. As this court has often noted, the distinction between descriptive and generic terms is one of degree. The distinction has important practical consequences, however; while a descriptive term may be elevated to trademark status with proof of secondary meaning, a generic term may never achieve trademark protection.

> A *suggestive* term suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods or services. A suggestive mark is protected without necessity of proof of secondary meaning. The term "Coppertone" has been held suggestive in regard to sun tanning products.

> *Arbitrary* or *fanciful* terms bear no relationship to the products or services to which they are applied. Like suggestive terms, arbitrary and fanciful marks are protectable without proof of secondary meaning. The term "Kodak" is properly classified as a fanciful term for photographic supplies. "Ivory" is an arbitrary term as applied to soap.

*Zatarain, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790–91 (5th Cir. 1983) (citations and quotation marks omitted), *abrogated on other grounds by KB Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 (2004). As indicated, suggestive, arbitrary, and fanciful marks are inherently distinctive. Descriptive marks are not inherently distinctive but may acquire distinctiveness through secondary meaning. Finally, a generic mark is never distinctive.

## II.    Application

### A.    Effect of Registration

Before examining the distinctiveness of CPA's marks, the Court first addresses the effect of CPA's registrations with the PTO. "Registration of a mark with the PTO constitutes prima facie evidence of the mark's validity and the registrant's exclusive right to use the registered mark in commerce with respect to the specified goods or services." 15 U.S.C. §§ 1057(b) & 1115(a). Commercial use of a mark for more than five years post-registration makes the mark "incontestable," and the mark can only be cancelled if: "(1) the mark has become generic; (2) the mark was abandoned; (3) the registration was obtained fraudulently; or, (4) the mark was used to misrepresent the source of the goods or services." *Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 125 (5th Cir. 1993) (citing 15 U.S.C. §§ 1064, 1065; *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 197 (1985); *Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1326 (Fed. Cir. 1983)). If the mark has not yet attained "incontestable" status, it still benefits from a presumption of validity. This presumption, however, may be rebutted by establishing the mark is not inherently distinctive.

-10-

*Amazing Spaces*, 608 F.3d at 237 (citing *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 119 ("[The] presumption is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark.").

In this case, CPA registered its "CPA 50E" mark in 2005, and it therefore qualifies as "incontestable." RJ Machine challenges the validity of the incontestable mark, however, based on two permissible grounds: (1) the mark has become generic, and (2) the registration was obtained fraudulently. CPA contends neither of these challenges is properly before the Court. As for RJ Machine's first challenge, CPA claims RJ Machine "has not alleged post-registration genericness." Mot. Summ. J. [#79] ¶ 17. The Court disagrees. RJ Machine's fundamental contention is that CPA's marks are generic because they define technical characteristics of the flow conditioner at issue and amount to the actual name of the product. To the extent CPA's argument is specifically premised on RJ Machine's supposed failure to allege *post-registration* genericness, the Court still disagrees. First, CPA cites no authority indicating that for a party to challenge an incontestable mark based on its genericness, it must prove the mark became generic post-registration (rather than prior to registration). Second, RJ Machine has actually made arguments indicating CPA's marks became generic post-registration. *See* Resp. [#81] at 4 (describing how a word for a product subject to a patent may, over the course of the patent's lifetime, become the identifying and generic name for that product to consumers in the relevant industry).

With respect to RJ Machine's second challenge, CPA characterizes it as an affirmative "fraud on the PTO" claim never before pleaded, and CPA therefore contends "[t]he Court cannot entertain this claim as a matter of law." *See* Reply [#95] ¶ 22. RJ Machine, however, raised its "fraud on the PTO" arguments as a defense to CPA's assertion of the incontestability of its "CPA 50E" mark and

the presumption of validity with respect to the "50E" mark. *See* Resp. [#81] at 6–7. Moreover, while it is true RJ Machine did not include a "fraud on the PTO" claim as a specific cause of action in its complaint, it did include allegations CPA failed to disclose pertinent information to the PTO in obtaining the registrations. *See* Compl. [#1] ¶ 28 ("The CPA-50E Registration does not disclaim the term '50E', and in prosecuting the CPA-50E Registration, CPA failed to disclose to the USPTO that the term '50E' had significance in the relevant industry."). Therefore, the Court concludes RJ Machine properly asserts the "fraud on the PTO" argument, and the Court can consider its merits.

Regarding CPA's "50E" mark registered in 2011, it is not incontestable, but the Court presumes its validity. As such, the burden shifts to RJ Machine to produce evidence the mark is generic or descriptive. If RJ Machine produces sufficient evidence, it will have "reduced the presumption of validity to evidence that the PTO is of the opinion that the ["50E" mark] is sufficiently distinctive to be legally protectable as a mark." *Amazing Spaces*, 608 F.3d at 239.

## B.     The Distinctiveness of CPA's Marks

"Whether a mark is inherently distinctive and whether it has acquired secondary meaning are questions of fact." *Id.* at 234. For CPA to prevail on its motion for summary judgment, it must demonstrate there are no genuine issues of material fact concerning whether its marks are inherently distinctive or, if its marks are descriptive, whether they have acquired secondary meaning. Relatedly, CPA must show there is no genuine issue of material fact regarding whether the marks are generic. CPA's proof of registration of its marks shifts the burden to produce evidence regarding the nature of these marks to RJ Machine.

### 1.     RJ Machine's Summary Judgment Evidence

RJ Machine has presented evidence supporting its contentions the marks are generic or

descriptive in nature.  Umesh Karnik, a researcher at NOVA, created the prototype at issue and labeled it the "NOVA-50E" as early as 1995.  *See* Resp. [#81-6] Ex. 4 (the Karnik Paper).  Blaine Sawchuk read the Karnik Paper and learned about the NOVA-50E while working for NOVA around this same time.  *Id.* [#81-4] Ex. 2 (Blaine Sawchuk Dep.) at 68:6–20.  The NOVA flow conditioner discussed in the Karnik Paper was an improvement on the existing Laws flow conditioner based on the Laws Patent.  Karnik Paper at 4.  Two designs were considered: the NOVA-60 because it had an overall solidity of 60% and the NOVA-50 because it had a solidity of 50%.  *Id.*  The NOVA-50 was further tested with a number of different hole sizes, creating the NOVA-50A, NOVA-50B, NOVA-50C, NOVA-50D, NOVA-50E, NOVA-50F, and NOVA-50G.  *Id.* at 10.  The paper concluded the NOVA-50E was the highest performing flow conditioner among the NOVA-50 options.  *Id.* at 11.  Blaine Sawchuk confirmed he understood the "50" in the "NOVA-50E" to refer to solidity of the flow conditioner and that he understood the different NOVA-50 models were based only on slight changes in hole diameter.  Blaine Sawchuk Dep. at 70:8–71:23.

In 2010, Blaine, Dale, and Danny Sawchuk authored a paper for a presentation to the American School of Gas Measurement.  *Id.* at 98:21–99:3; Resp. [#81-5] Ex. 3 (the Sawchuk Paper).  The paper's stated purpose was to "review[] testing carried out by Southwest Research Inc. and the NOVA Research and Technical Centre performed on the CPA 50E flow conditioner . . . ."  Sawchuk Paper at 1.  The testing performed by Southwest Research occurred in 1996 or 1997, and the plate tested was the NOVA-50E made by Umesh Karnik.  Blaine Sawchuk Dep. at 100:9–11; 100:23–101:25.  The Sawchuk Paper also relied on Karnik's testing of the NOVA-50E outlined in the Karnik Paper from 1995.  Sawchuk Paper at 9 n.11.  While the paper suggests the testing was carried out on the CPA 50E, Sawchuk admitted in his deposition that this was a false statement

because the device actually tested was the NOVA-50E. Blaine Sawchuk Dep. at 102:1–10. Sawchuk testified he claimed the device tested was the CPA 50E because "[t]hat's the flow conditioner that the customers buy and recognize," but the only difference between the NOVA-50E Southwest Research and Karnik tested and the CPA 50E was the name. *Id.* at 101:7–25.

Sawchuk, in marketing and selling the CPA 50E to customers, provided them with the summary of the research performed on the NOVA-50E, so the customers would not have to read the research themselves. *Id.* at 112:22–113:13; 141:17–142:1. There is evidence CPA sent emails to customers referring to their product as the "CPA50E/NOVA50E" with the research papers documenting testing performed on the NOVA-50E attached. Resp. [#81-9] Ex. 7. Sawchuk acknowledged he named his CPA product the "CPA 50E" "to show a linkage" with the NOVA-50E and the research that had been performed on the NOVA-50E. *Id.* at 126:2–7.

Beyond the evidence of the CPA 50E's origin and its nexus with the NOVA-50E, RJ Machine has provided six affidavits from customers in the flow conditioner industry in which they state (1) their understanding the terms "50E" and "CPA 50E" identify a type of flow conditioner, (2) they do not associate any brand loyalty or affinity with the term "50E," and (3) their interest as customers is obtaining a flow conditioner with approximately 50% solidity and a particular flow profile, which is found in various companies' flow conditioners. Resp. [#81-11] Ex. 9.[1]

### 2.    CPA's Summary Judgment Evidence

CPA has presented its own evidence supporting its contentions the marks, if not inherently distinctive, are, at a minimum, descriptive with secondary meaning, and are not generic. As CPA

---

[1] CPA has moved to strike these affidavits. The Court addresses the motion below and, for the reasons explained, denies it. *See infra* p. 20. The Court considers RJ Machine's affidavits as part of the factual record on summary judgment.

points out, the parties agree there is nothing prohibiting RJ Machine from making flow conditioners with a 50% solidity and from advertising that fact to consumers. Mot. Summ. J. [#79-3] Ex. 3 (Schuessler Dep.) at 165:12–21.[2] The parties also agree there is nothing precluding RJ Machine from telling customers the design for its flow conditioner is based on the design that NOVA used in its testing from the 1990s. *Id.* at 166:9–13. CPA's objection is to RJ Machine's supposed attempt to piggyback on its brand "50E" when customers associate "50E" with CPA.

Regarding the meaning of "50E," CPA presents evidence suggesting "50E" does not actually describe the technical characteristics of its flow conditioner. In his declaration, Sawchuk states the 50E, instead of having a 50% solidity, actually has a 47.8% porosity and 52.2% solidity. Sawchuk Decl. ¶ 3. In addition, according to Sawchuk, CPA has also developed other lines of flow conditioners including the 55E and the 65E, which do not have 55% solidity and 65% solidity respectively. *Id.* Relatedly, RJ Machine's corporate representative testified he never tells customers the specific percent solidity of the RJ Machine flow conditioner, and customers never request a flow conditioner with a certain percentage solidity. Schuessler Dep. at 25:8–26:6. Concerning the "E," RJ Machine's corporate representative testified the letter "E" describes nothing to consumers about the function of the flow conditioner. *Id.* at 30:4–20. Moreover, RJ Machine's corporate representative testified he could not identify customers who refer to the 50E as a test artifact number used by NOVA or who were familiar with NOVA's research on flow conditioners from the 1990s. *Id.* at 11:14–25.

With respect to whether consumers associate "50E" with CPA, RJ Machine acknowledges the NOVA prototype was never used in commerce, and no one has used "50E" in commerce besides

---

[2] RJ Machine designated John Chandler Schuessler as its Rule 30(b)(6) corporate representative.

CPA. Sawchuk Decl. ¶ 3; Schuessler Dep. at 14:5–7, 138:25–139:3. According to Blaine Sawchuk, since 1999, when CPA started selling its 50E flow conditioner, CPA has spent millions of dollars promoting its 50E and CPA 50E trademarks at conferences, trade shows, courses, seminars, and customers' businesses. Sawchuk Decl. ¶ 4. During that time, CPA has used various marketing channels including its website, over the phone, through publications, by mail, and via email. *Id.*

As for consumer evidence, CPA has presented the declarations of thirty-two participants in the flow measurement industry who all swear, among other things: (1) they consider 50E and CPA 50E as brand names associated with CPA and no other producer; (2) these brand names do not describe flow conditioners generally or refer to flow conditioners generally; (3) to them, these brand names do not describe any physical aspects or functions of flow conditioners; (4) to their knowledge "50E" is not a term regularly used in the flow measurement industry to refer to anything other than CPA flow conditioners; and (5) other than those produced by CPA, they know of no other flow conditioner that is referred to as "50E" or "CPA 50E." Mot. Summ. J. [#79-5] Ex. 5.

In addition to the consumer declarations, CPA has presented consumer specifications indicating CPA 50E as the desired flow conditioner. Mot. Summ. J. [#79-6] Ex. 6 (consumer specifications from Anadarko Petroleum Corporation, Columbia Pipeline Group, DCP MidStream, LP, and Dominion Transmission, Inc.). RJ Machine's president acknowledged consumers associate "50E" with CPA. Mot. Summ. J. [#79-4] Ex. 4 (Martin Dep.). RJ Machine's position is it needs to call its flow conditioner the 50E to compete, but when asked if the dimensions of the RJ Machine flow conditioner are the same as those of CPA's 50E flow conditioner, RJ Machine's corporate representative responded: "I don't know." Schuessler Dep. at 118:5–11. Yet RJ Machine also

agrees "extremely minor variations in the hole spacing and sizing of a perforated plate flow conditioner can cause large changes in performance." Schuessler Dep. at 132:19–23.

### 3.    Summary of the Current Record

As an initial matter, RJ Machine has met its burden to produce evidence CPA's marks are generic or descriptive in nature, reducing CPA's registrations (and the accompanying presumptions) to merely evidence the PTO believes the marks are sufficiently distinctive to be legally protectable as marks. RJ Machine has documented the 50E's origins in the NOVA research, how the Sawchuks based their "50E" flow conditioner on this research, and how CPA has since relied on that research in representing to the public the CPA 50E and the NOVA-50E are the same flow conditioner. The NOVA research notably indicates "50E" describes physical characteristics of the flow conditioner. RJ Machine has also presented affidavits from consumers indicating their belief that the primary significance of the terms "50E" and "CPA 50E" are as identifiers of a type of flow conditioner and not as identifiers of the source of a product. These consumers do not associate any brand loyalty with the term "50E," and they are solely interested in purchasing flow conditioners with certain solidities and profiles.

CPA has presented evidence disputing RJ Machine's record. Blaine Sawchuk represents "50E" has no relationship with the physical characteristics of the flow conditioner, and CPA highlights testimony from RJ Machine admitting consumers do not make purchasing decisions based on the flow conditioner's solidity or if the flow conditioner has the same profile as the NOVA-50E. CPA also presents evidence it is the only company to ever sell a flow conditioner labeled "50E," and it has spent millions of dollars in promotion of its trademarks over the course of fifteen years. CPA's consumer evidence includes thirty-two affidavits all indicating their belief the primary significance

of "50E" and "CPA 50E" is as a source identifier for CPA's flow conditioner, and they do not understand these marks as describing flow conditioners generally.

The parties' competing evidence demonstrates a host of disputed fact issues. In general terms, the fact questions revolve around whether the marks are distinctive. RJ Machine has, at a minimum, shown evidence of the marks' descriptive nature. And given the distinction between descriptive and generic terms is one of degree, the Court finds RJ Machine has provided facts suggesting the marks may be generic. On the other hand, CPA's evidence could support a finding the marks are inherently distinctive. If the marks are instead determined to be descriptive, the parties have again produced contradicting evidence as to secondary meaning.

Contained within each of these broader fact questions are numerous other more specific factual determinations. The Court, as fact finder, will resolve these disputed facts on a full trial record. CPA has failed to show it is entitled to summary judgment, and the Court denies its motion.

**4.      Fraud on the PTO**

While the rub of this case lies in the factual disputes just outlined, the Court does briefly address what it considers RJ Machine's two secondary arguments regarding the marks' genericness: (1) fraud on the PTO and (2) failure to exercise quality control.

First, "to succeed on a claim of fraudulent registration, the challenging party must prove by clear and convincing evidence that the applicant made false statements with the intent to deceive the licensing authorities." *Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 126 (5th Cir. 1993). According to RJ Machine, Sawchuk falsely made a declaration in support of CPA's application for trademark registrations for "50E" and "CPA 50E" because he "falsely attested to [CPA's] ownership

of '50E' despite knowing that the name and 50E flow conditioner product were not given, sold or exclusively licensed by NOVA Gas Transmission as provided in its letter." *Id.* [#81] at 6.

As evidence, RJ Machine presents the supposedly false declaration, which provides in relevant part:

> [Sawchuk] believes [CPA] to be the owner of the trademark sought to be registered, and that . . . no other person, firm, corporation, or association has the right to use the mark in commerce, either in identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his own knowledge are true; and that all statements made on information and belief are believed to be true.

Resp. [#81-12] Ex. 10 at 5.

In addition to the false declaration argument, RJ Machine also argues fraud because CPA supposedly "failed to submit any disclaimers showing a good faith attempt at disclosing the technical characteristics associated with the 50E." *Id.* at 7. In particular, RJ Machine claims CPA should have disclosed the Karnik Paper and the NOVA50-E prototype, and if it had done so, the PTO would not have issued the registrations or "50E" or "CPA 50E." *Id.*

CPA responds that the only fact RJ Machine was obligated to disclose was any prior use of the marks *in commerce*. Reply [#95] at 12. For this contention, CPA cites the definition of a trademark, which includes the requirement the term be used in commerce to identify one's goods or services. *Id.* at 13 (citing 15 U.S.C. § 1127). Because there is no dispute the marks were not previously used in commerce, CPA argues the "fraud on the PTO" argument fails.

Regarding RJ Machine's affirmative misrepresentation theory, the Court is unclear on its factual basis and specifically why Sawchuk's declaration is supposedly false. Regarding RJ Machine's fraudulent omission theory, the Court is unclear on its legal basis as RJ Machine cites no

relevant legal authority.  Regardless, there appear to be factual issues entailed in the question of whether CPA committed fraud in obtaining its trademark registrations.  The Court can better handle these issues on a trial record as compared to the current summary judgment record.

### 5.    Quality Control

With respect to the quality control argument, RJ Machine argues "the lack of care exercised over CPA's product renders CPA's marks generic as it has failed to exercise continued use and care of its marks." *Id.* at 9.  Curiously, RJ Machine has not cited a single legal authority for its quality control argument.  The gist of RJ Machine's line of thinking is that CPA outsources manufacturing of its 50E flow conditioners to four companies, and despite RJ Machine's requests, CPA has failed to produce documents evidencing quality control procedures over the manufacturing process performed by these four third parties. *Id.* at 7.  According to RJ Machine, if the facts show a lack of quality control, then the marks should be declared generic, and because of the lack of discovery, there are undetermined fact issues precluding summary judgment.

Similar to RJ Machine's fraud on the PTO argument, the Court is unclear on both the factual and legal basis for RJ Machine's quality control theory.  Nonetheless, the Court finds these questions better resolved on a full trial record.  To the extent the argument is legally valid, there are a number of disputed factual issues, making summary judgment inappropriate.

## III.    Motion to Strike

CPA moves to strike six affidavits provided by RJ Machine on multiple grounds, each of which the Court rejects.  First, CPA complains one of the affiants is a "co-owner of RJ [Machine] in a common private company," and another "sent a document titled 'CPA 50E' to RJ [Machine] to see 'if this will help you.'" Reply [#95] at 7.  If anything, these claims would implicate credibility,

but they do not impact the admissibility of the affidavits on summary judgment. Furthermore, there are also four other affiants providing the same declarations.

Second, as to all six affidavits, CPA argues they "'manufacture a dispute of fact merely to defeat a motion for summary judgment.'" *Id.* (quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000)). According to CPA, RJ Machine's Rule 30(b)(6) designee previously testified "no one refers to '50E' as a class of products," and the Court should strike RJ Machine's affidavits, which CPA contends contradict the testimony of the corporate representative. *Id.* at 8. CPA's contention relies on a mischaracterization of the corporate representative's statements. CPA cites the following testimony:

> Q. As I understand it, no customer or anyone has ever referred to you in discussions about flow conditioners and used the term 50E to refer to a flow conditioner made by a company other than Canada Pipeline Accessories?
>
> A. 50E, no, sir.
>
> . . .
>
> Q. Can you identify anyone who refers to 50E today and over the last 10 years as a class of products and not a product made by Canada Pipeline Accessories?
>
> A. No.

*See id.* (citing Schuessler Dep. at 12:11–16; 18:24–19:2).

Concerning the first question, the Court fails to see its relevance for the instant issue. No party would dispute the fact no company besides CPA has made a flow conditioner referred to as the "50E" considering CPA long had the exclusive right to make the flow conditioner described in the Laws Patent and in the Karnik Paper. By acknowledging this fact, RJ Machine's corporate representative was not admitting "no one refers to '50E' as a class of products." Moreover, there

would be nothing inconsistent about an individual understanding CPA as the only manufacturer of the 50E while simultaneously understanding the 50E as a class of products.

As to the second question, the deponent's response of "No" does not equate to, as CPA suggests, the statement "no one refers to '50E' as a class of products." First, the question is conjunctive, meaning the testimony, if anything, means the corporate representative cannot identify anyone who refers to the 50E as a class of products *and* not a product made by CPA. As covered by the first question, nobody would dispute the 50E is not a product made by CPA, so the response had to be "no" on that basis alone. As a result, the testimony does not specifically reveal whether the deponent can identify anyone who refers to the 50E as a class of products. Finally, the question merely asks the deponent whether he personally, and as a representative of RJ Machine, can identify individuals with those two understandings of the term "50E." The statements of the six affiants, who are customers in the industry, as to their understanding of the terms "50E" and "CPA 50E" cannot contradict RJ Machine's corporate representative's testimony regarding whether he can identify anyone who both refers to the 50E as a class of products and does not refer to the 50E as a product made by CPA. In other words and in sum, the statements in the affidavits are not inconsistent with the corporate representative's deposition testimony.[3]

Third, CPA urges the Court to strike the affidavits as vague because they do not explain what is meant by "particular flow profile," "various companies," "brand loyalty or affinity," or "type of

---

[3] The Court notes the Fifth Circuit cases cited by CPA are inapposite as they each involve affidavits contradicting the sworn testimony of the same party. *See Doe ex rel. Doe*, 220 F.3d at 386; *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984). Here, CPA suggests the affidavits of industry customers contradict the sworn testimony of RJ Machine representatives.

flow conditioner." Reply [#95] at 9. The Court disagrees and finds them sufficient to illustrate fact issues on a summary judgment record.

Fourth, at the pretrial status conference held January 29, 2015, CPA's counsel suggested the six affiants were not disclosed as witnesses under the discovery deadlines and therefore should not be allowed to testify. *See* Tr. Jan. 29, 2015 Status Conference [#100] at 22:4–12. Because they would not be allowed to testify, CPA's counsel contended their affidavits should not be considered on summary judgment. *Id.* at 22:13–16. As the Court made clear at the hearing, whether these particular affiants were timely disclosed and will be allowed to testify at trial is not currently at issue and does not prohibit the Court from considering the affidavits on a summary judgment record. These affidavits merely illustrate genuine issues of material fact and are properly considered at this juncture of the litigation.[4]

For the reasons described, the Court DENIES CPA's motion to strike.

## Conclusion

The parties' summary judgment briefing and accompanying exhibits result in a record containing various disputed questions of fact.

Accordingly,

IT IS ORDERED that Defendant Canada Pipeline Accessories Co. Ltd.'s Motion for Summary Judgment [#79] is DENIED;

IT IS FURTHER ORDERED that Defendant Canada Pipeline Accessories Co. Ltd.'s Motion to Strike [#95] is DENIED; and

---

[4] CPA has moved to exclude these six affiants from testifying as witnesses at trial in a separate motion. *See* Mot. Exclude [#102]. The Court does not address that motion in this order.

-23-

IT IS FINALLY ORDERED that the parties' Joint Motion Requesting Bench Trial [#101] is GRANTED.

SIGNED this the _31ᵃˢ_ day of March 2015.

SAM SPARKS
UNITED STATES DISTRICT JUDGE