FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2015 JUL 15  PM 4: 46

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

RJ MACHINE COMPANY, INC.,
**Plaintiff,**

-vs-                                                                    Case No.  A-13-CA-579-SS

CANADA PIPELINE ACCESSORIES CO. LTD.,
**Defendant.**

## O R D E R

BE IT REMEMBERED on the 1st day of June, 2015, the Court held a bench trial in the above-styled cause, and the parties appeared by and through counsel.  The trial of this matter lasted two days, and the Court heard testimony from the following witnesses: Dale Sawchuk, Blaine Sawchuk, Michael Roseborough, John Chandler Schuessler, Gregg Perkin, Gary Martin, and Stephen Stark.  Having considered the evidence and testimony presented at trial, the arguments of counsel, the parties' briefs, and the governing law, the Court enters the following findings of fact and conclusions of law.

### Findings of Fact

**I.       Background**

Plaintiff RJ Machine Company, Inc. (RJ Machine) manufactures and sells a "flow conditioner" product and seeks to call its product by the name "50E."  Defendant Canada Pipeline Accessories Co. Ltd. (CPA), which owns registered trademarks in the words "50E" and "CPA 50E," opposes RJ Machine's efforts to call its flow conditioner by the name "50E" and has threatened enforcement of its trademark rights in the event RJ Machine proceeds to market using CPA's mark.

In response, RJ Machine filed the instant declaratory judgment action, seeking, among other things, a finding by the Court that CPA's registered marks are not protectable under trademark law.

In basic terms, a "flow conditioner" is a device used in pressurized pipelines to assist in the measurement of the flow of fluids (liquid or gas). The basic goal of a flow conditioner is to manipulate fluid flow conditions to achieve accurate metering. Testimony from multiple witnesses indicated there are different types of flow conditioners. For instance, CPA's expert, Stephen Stark, testified there are tube bundle flow conditioners, which existed as early as the mid-1900s, vane-style flow conditioners, and tabbed flow conditioners. Another category of flow conditioner is the perforated plate, which, in layman's terms, is a metal plate with holes, and the holes can vary in number, size, and arrangement. There a number of different manufacturers of perforated plate flow conditioners, including Gallagher, Emerson, Canalta, Mitsubishi, and others. CPA sells a particular type of perforated plate flow conditioner at issue in this case, which it calls the "CPA 50E" or the "50E." RJ Machine also makes a perforated plate flow conditioner and seeks to call it the "50E."

## II.    Origins of the CPA 50E

Blaine Sawchuk, an engineer, previously worked for a company called NOVA Gas Transmission (NOVA) from 1979 to 1997. While working for NOVA, he became familiar with a prototype flow conditioner developed and tested internally by NOVA's research and development team. Dr. Umesh Karnik performed the research and testing, and labeled the prototype the "NOVA50-E"[1] in a paper he wrote in 1995. Pl.'s Trial Ex. 10 (the 1995 Karnik Paper).

---

[1] In Karnik's original paper from 1995, he first described his prototype as the "NOVA50-E." *See* Pl.'s Trial Ex. 10. In that same paper, Karnik referred to some of the various prototypes with the form "NOVA-50" or "NOVA-60." *Id.* Since that original work, the "NOVA50-E" has been referred to in various forms. *See, e.g.*, Pl.'s Trial Ex. 50 (a collection of research papers on the "NOVA50-E" but referring to that prototype in different ways including "NOVA 50E," "NOVA50E," and "NOVA-50E"). In considering the briefing and the record in this case, the Court observes the parties most often refer to the prototype as the "NOVA 50E." For simplicity and consistency, the Court will do the same.

The NOVA 50E flow conditioner discussed in the 1995 Karnik Paper was an improvement on a design originally invented and patented by Elizabeth Laws. *Id.* at 4. The patent, United States Patent No. 5,341,848, is owned by Den Norske Stats Oljeselskap A.S. (Statoil). Pl.'s Trial Exs. 14 (the Laws Patent), 13 (Statoil/CPA License Agreement indicating Statoil's ownership of the Laws Patent). The design from the Laws Patent involved one center hole, a circle of eight holes around that center hole, and a circle of sixteen holes around the circle of eight holes. Laws Patent at 1. The Court refers to the concentric circles design from the Laws Patent as the "1-8-16 Design." Karnik considered two 1-8-16 Designs: the NOVA 60 because it had an overall solidity of 60% and the NOVA 50 because it had an overall solidity of 50%. 1995 Karnik Paper at 4. The NOVA 50 was tested with a number of different hole sizes, creating the NOVA 50A, NOVA 50B, NOVA 50C, NOVA 50D, NOVA 50E, NOVA 50F, and NOVA 50G. *Id.* at 10. The paper concluded the NOVA 50E was the highest performing flow conditioner among the NOVA 50 options. *Id.* at 11.

Blaine Sawchuk read the 1995 Karnik Paper and learned about the NOVA 50E while working for NOVA. Blaine Sawchuk confirmed he understood the "50" in "NOVA 50E" to refer to the solidity of the flow conditioner and that he understood the different NOVA 50 models were based only on slight changes in hole diameter. In 1997, he left NOVA to start his own company with his brother, Dale Sawchuk. That company was CPA. After starting CPA, the Sawchuks obtained permission from NOVA "to manufacture and sell the flow conditioner developed by NOVA." *See* Pl.'s Trial Ex. 22 (NOVA Permission Letter). NOVA is in the business of gas transmission and only conducted research and development with respect to flow conditioners. While the NOVA 50E prototype emerged from that research and development work, NOVA has never manufactured or sold flow conditioners itself, nor used "NOVA 50E" or "50E" in commerce.

According to the NOVA Permission Letter authored by NOVA engineer Phil Barg and dated March 25, 1997, NOVA was "happy to grant [CPA] permission" to manufacture and sell the flow conditioner developed by NOVA, but NOVA included the following four conditions: (1) all patent issues were to be resolved by CPA; (2) the flow conditioner "should not be named the NOVA Flow Conditioner, or after NOVA in any other way"; (3) CPA's literature should reference the work done by NOVA; and (4) CPA should not imply NOVA supports or endorses the marketing of the flow conditioner. *Id.* Barg stated NOVA "appreciate[d] the work [CPA] [was] doing to move the [NOVA-developed] flow conditioner through the process to be accepted by Industry Canada, and [would] try to provide data or help if [CPA] need[ed] it." *Id.*

In addition, since at least part of the technology underlying the NOVA 50E was covered by the Laws Patent, CPA obtained a license in 1997 from Statoil for the right to use the flow conditioner design disclosed by the Laws Patent. *See* Statoil/CPA License Agreement. Specifically, Statoil granted "CPACL"[2] a non-exclusive license "to manufacture and install in metering stations in Canada and United States of America an unrestricted number of the K-Lab Laws and K-Lab Laws Model Nova Flow Conditioner under PATENTS."[3] *Id.* ¶ 3.1. In other words, CPA obtained a non-

[2] Apparently, CPA referred to itself as CPACL, as in Canada Pipeline Accessories Company Ltd., in its early stages. In addition, while not entirely clear, the record indicates CPA did not call its flow conditioner the "CPA 50E" or the "50E" until approximately 1999. From 1997 to 1999, the company apparently called the flow conditioner the "CPACL flow conditioner." The record evidence supporting this understanding includes: (1) Dale Sawchuk's testimony; (2) the "CPA 50E" trademark application with the PTO, indicating a first use date of December 31, 1997, but a use-in-commerce date of June 30, 1999, *see* Pl.'s Trial Ex. 2; and (3) a report from June 1998 authored by Umesh Karnik and others for the International Pipeline Conference discussing the "CPACL flow conditioner," *see* Pl.'s Trial Ex. 50 at 74–83.

[3] "PATENTS" refers to Exhibit 1 of the agreement and includes the Laws Patent. *See* Statoil/CPA License Agreement ¶ 2.2; *id.* at 16.

-4-

exclusive license to make and sell the NOVA 50E. The license would end upon the expiration of the Laws Patent, which occurred in March 2012.

Under the agreement, however, CPACL obtained no ownership rights in the "TECHNOLOGY." *Id.* ¶ 3.2. "TECHNOLOGY" is defined as "any and all technical information related to the K-Lab Laws Flow Conditioners as claimed in the PATENTS and as described in TECHNICAL INFORMATION." *Id.* ¶ 2.3. "TECHNICAL INFORMATION" references Exhibit 2 of the agreement, and Exhibit 2 includes the "Design Manual for K-Lab Laws Flow Conditioner." *Id.* ¶ 2.5; *id.* at 17. The K-Lab Design Manual describes the basis for the design and installation of different types of K-Lab flow conditioners, including the NOVA 50E. *See* Pl.'s Trial Ex. 26 (the K-Lab Design Manual) at 1. The K-Lab Design Manual includes detailed descriptions for the NOVA 50E. *Id.* ¶ 4.3. In sum, CPA had a non-exclusive right—as of 1997—to manufacture and sell flow conditioners with the NOVA 50E design, but it did not own the underlying technology.

After 1997, CPA executed multiple amendments with Statoil to the license agreement. *See* Pl.'s Trial Ex. 32. In 2002, the parties executed their fourth amendment, which gave CPA an exclusive license to make and sell flow conditioners with the NOVA 50E design. *Id.* The amendment was made "[i]n order to improve the penetration and the commercial viability of K-Lab Laws flow conditioners (FC), in particular the model NOVA 50E . . . ." *Id.* At trial, Blaine Sawchuk acknowledged that under the license agreement, CPA was to pay royalties to Statoil based on sales of flow conditioners with the NOVA 50E design, and CPA did pay such royalties. Blaine Sawchuk simultaneously acknowledged CPA calculated and made those royalty payments based on sales of what CPA referred to as the "50E" or "CPA 50E."

III.    **CPA's Business from 1997 to 2015**

A.    **The Promotional Package**

Once CPA had the right to make and sell a flow conditioner with the NOVA 50E design, the next critical step in the company's success was effectively marketing its flow conditioner product and establishing its reputation with consumers.  Sometime around 1999 or 2000, Blaine Sawchuk compiled a set of research papers as part of a promotional package he sent to potential customers. *See* Pl.'s Trial Ex. 50 (the Promotional Package).  The general aim of the Promotional Package was to convince customers that CPA's flow conditioner was a quality product that had undergone research and testing, and was compliant with applicable regulations and standards.  The actual flow conditioner that was the subject of the research and testing, however, was the NOVA 50E prototype, not CPA's 50E flow conditioner.  Indeed, each research paper in the Promotional Package is prefaced with a "CPACL NOVA 50E RESEARCH PAPER SUMMARY" written by Blaine Sawchuk.  The following is a list of the research papers with a title provided by the Court, the date of the paper's publication, and a brief description of each based on Blaine Sawchuk's summaries:

(1)   The 1995 Karnik Paper (March 1995):  This is Karnik's original paper, "[a] detailed design paper which is the first paper released to industry announcing the development of the NOVA 50E flow conditioner."

(2)   The Morrow Report (December 1997):  Dr. Tom Morrow of the Southwest Research Institute tested a variety of flow conditioners in 4-inch lines.  This report reflects the research he performed on what he referred to as "the NOVA Perforated Plate #50E Flow Conditioner" in addition to "the Standard 19-Tube Bundle Straightening Vane Flow Conditioner"; "the Stuart C-3 Tube Bundle Straightening Vane Flow Conditioner"; and "the Gallagher Perforated Plate #21 Flow Conditioner."

(3)   The Karnik/Studzinski/Geerligs/Kowch Report (June 1999): This research project tested the NOVA 50E flow conditioner on an 8-inch line as compared to a 4-inch line and verified its scalability.

-6-

(4)  The 1998 Karnik Paper (June 1998): Karnik performed testing on the NOVA 50E as compared to a tube bundle when it comes to work on ultrasonic meters, and, according to Blaine Sawchuk, "[t]he CPACL NOVA 50E flow conditioner improves the performance of both ultrasonic meters " while "the 19[-]tube bundle is inconsistent and hence deemed to be unsatisfactory."

(5)  The Brown Paper (May 1998): Michael Brown examined the results of a metering facility using ultrasonic meters and "NOVA 50E flow conditioners."

(6)  The Sawchuk/Beck Paper (June 1998): Blaine Sawchuk and Bill Peck authored this "entry level paper which is used to provide a technical overview for the measurement practitioner who is not involved in the technology."

(7)  The Centaur Project Paper (April 1999): "The Centaur Project began in January of 1999 as a design for a suitable traceable reference for TransCanada Calibrations['s] multimillion dollar high pressure test facility.  Its design includes a NOVA 50E flow conditioner, multipath ultrasonic meter, reference turbine meter and meter tubes with a fusion bonded epoxy coating applied to their internals."

(8)  The 1994 Karnik Paper (May 1994): Karnik wrote this paper, which "provides a very technical background relating to the effects of velocity profile and turbulence profile on orifice metering" before the "NOVA model 50E" was invented, but the "information initiated a strong effort to develop the NOVA 50E (CPACL) Flow Conditioner Plate."

(9)  The Morrow Tube Bundle Paper (May 1997): In this paper, Morrow "does not provide performance of flow conditioner perforated plates, but [he] does provide clear evidence as to why the classical 19[-]tube[] tube bundle does not work."

(10)  The Morrow Periodical (August 1995): This periodical discusses some of Morrow's research done with the Southwest Research Institute and references the positive performance of "the NOVA 50E."

(11)  The Morrow Paper (May 1995): Morrow, while working for the Southwest Research Institute, was the first to test the performance of "the NOVA 50E flow conditioner." This research contains substance similar to that of the Morrow Report described above.

(12)  The Measurement Canada Approval (March 1997): "This is the Canadian Government approval document which approves the use of the NOVA 50E for use in custody transfer measurement applications in Canada.  [Without] this document, the 50E [cannot] be used in Canada for measuring natural gas for fiscal purposes. Noteworthy is the detailed presentation of the tube bundle for inspection purposes[;]

-7-

other type[s] of Flow Conditioners [cannot] be inspected due to the secrecy regarding design."

*Id.*

In addition to these twelve documents, which are all part of Exhibit 50, the record also contains at least one other similar exhibit, Exhibit 31, which contains a research paper with a "CPACL NOVA 50E RESEARCH PAPER SUMMARY" cover page. Exhibit 31 is a paper authored by Phil Barg, Blaine Sawchuk, and Dale Sawchuk (the Barg/Sawshuk Paper) in May 2000, and it "reviews testing carried out by Southwest Research Inc. and the NOVA Research and Technical Centre performed on the CPA 50E flow conditioner in accordance with AGA-3/API 14.3 and ISO 5167-2."[4] Pl.'s Trial Ex. 31. Blaine Sawchuk admitted the testing referenced was actually performed on the NOVA 50E, not the CPA 50E.

While CPA's witnesses claim otherwise, the record indicates CPA continued to send out the Promotional Package (or other similar materials reflecting research and testing performed on the NOVA 50E) to potential purchasers of the CPA 50E as recently as 2012. For instance, in 2010, the three Sawchuks authored a paper for a presentation to the American School of Gas Measurement. *See* Pl.'s Trial Ex. 27. The paper reviews "testing carried out by Southwest Research Inc. and the NOVA Research and Technical Centre performed on the CPA 50E flow conditioner in accordance with AGA3/API 14.3 and ISO 5167." *Id.* at 1. In other words, the Sawchuks summarized the research and testing from Karnik and Morrow that was performed on the NOVA 50E. In addition, in 2011, Danny Sawchuk sent emails to a potential customer drawing the connection between the NOVA 50E research and the CPA 50E, stating: "I've attached some papers that show the

---

[4] "AGA-3/API 14.3" refers to the American standard for orifice plates used to measure flow conditions, and "ISO 5167-2" refers to the international standard.

CPA50E/NOVA50E effectiveness on USM performance." Pl.'s Trial Ex. 40. Finally, Chandler Schuessler of RJ Machine testified that he came across some of the research papers related to the NOVA 50E on CPA's website in 2012, although he did not specifically identify which papers.

**B.      Marketing and Development of CPA's Brand**

Dale Sawchuk, who has mostly handled the business operations and sales of CPA, testified regarding the development of CPA over the years. The company began in 1997 as a two-man operation with Dale and Blaine Sawchuk, and the two brothers have built CPA into a successful venture over almost twenty years. CPA currently has three principals in Dale, Blaine, and Danny (Dale's son) Sawchuk and nine employees. Since around 2000, CPA has spent a significant amount of its total revenue—around $400,000 to $600,000 per year—on marketing its products to potential customers worldwide. Those marketing efforts have included direct communications through mail, email, phone, and personal meetings; attendance at trade shows, courses, and seminars; promotional brochures; presenting papers at industry conferences; and a website. Dale Sawchuk credibly testified CPA has spent an enormous amount of effort and resources trying to establish CPA and its 50E flow conditioner in the marketplace. CPA has also labeled its flow conditioners with the marks "CPA 50E" and "50E" and used these marks in advertisements. *See, e.g.*, Def.'s Trial Exs. 7A–7P (examples of CPA advertisements and promotional materials).

One of CPA's main objectives in pursuing growth has been to convince customers to put CPA and its flow conditioners on the specification forms common in the industry. Examples of those specification forms are in the record and reflect various consumers requesting a "CPA 50E flow conditioner" be used on the project at issue. *See, e.g.*, Pl.'s Trial Exs. 44–48; Def.'s Trial Exs. 51, 52. Also in the record are emails from consumers indicating their interest in "CPA 50E" flow

conditioners or the "50E." *See, e.g.*, Def.'s Trial Exs. 11, 13–14, 16. These specifications and emails reflect both that customers associate "50E" with CPA and that the "CPA 50E" is a brand of flow conditioner.

Dale Sawchuk testified that he has never discussed with a customer the significance of "50" as it relates to the solidity of the plate, nor has he ever discussed the significance of "E" as it relates to the configuration and size of the holes. CPA's expert, Stephen Stark, who has worked in the measurement industry since 1977, credibly testified plate solidity is not a factor that is important to him in selecting a flow conditioner.

Generally speaking, CPA has developed a successful flow conditioner business and effectively established a strong reputation for itself and its 50E flow conditioner among industry participants. Chandler Schuessler, RJ Machine's manager of flow conditioner operations, conceded that CPA, and more specifically Blaine and Dale Sawchuk, are well known in the industry. Schuessler further acknowledged that no company other than CPA has ever used the mark "50E" to refer to its flow conditioner and that customers understand "50E" to refer to a CPA product.

## C.   Trademark Registrations with the PTO

CPA registered two trademarks with the United States Patent and Trademark Office (PTO): (1) the word mark "CPA 50E" in 2005 (U.S. Trademark Registration No. 2,994,138); and (2) the word mark "50E" in 2011 (U.S. Trademark Registration No. 3,934,642). Pl.'s Trial Exs. 2, 1. Regarding the "CPA 50E" mark, the PTO ultimately issued a certificate of incontestability after the applicable five-year statutory period passed. Regarding the "50E" mark, CPA applied on October 12, 2009, and along with the application, Blaine Sawchuk provided the following sworn declaration:

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or form or any resulting registration, declares that he is properly authorized to execute this application on behalf of the applicant, he believes the applicant to be the owner of the trademark sought to be registered, and that the mark is in use in commerce, or, if the application is being filed under 15 U.S.C. §§ 1051(b), 1126(d), or 1126(e), he believes applicant to be entitled to use such mark in commerce; to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive, and that all statements made of his own knowledge are true, and that all statements made on information and belief are believed to be true.

Pl.'s Trial Ex. 12.

## D.     Quality Control

Regarding its quality control, CPA does not manufacture its flow conditioner products and instead outsources that task to four independent companies. CPA employees who oversee the quality control process include Blaine Sawchuk, Danny Sawchuk, and Ralph Salerio. Although the specifics of CPA's quality control process were not made clear at trial, there does appear to be some sort of process in place. Once a shipment of flow conditioners arrives, it is quarantined, and each flow conditioner is inspected against the original drawings. If a product passes inspection, it is allowed into CPA's inventory in order to be shipped to consumers. If it fails inspection, it returns to the machine shop. Blaine Sawchuk testified inspection sheets are filled out as part of the quality control process, and those documents are maintained in hard copy form.

## IV.     RJ Machine's Business

Gary Martin, the president of RJ Machine, started the company approximately twenty years ago, but it was only after expiration of the Laws Patent in March 2012 that RJ Machine decided it

wanted to enter the flow conditioner market. The individual hired to design RJ Machine's flow conditioner, Michael Roseborough, used the NOVA 50E as the basis for RJ Machine's new product. As all sides agree, RJ Machine is free to use the NOVA 50E design, or the CPA 50E design, for its flow conditioner. Relatedly, all sides agree RJ Machine can advertise the solidity of its plate and its relationship to the NOVA 50E and the NOVA 50E research contained in the Promotional Package.

RJ Machine started selling its flow conditioner in 2013. Chandler Schuessler has spoken with many customers in the flow conditioner industry, and according to his testimony, he has never discussed with a customer the NOVA prototypes, the 1995 Karnik Paper, the solidity of flow conditioners, or the importance of an "E" design for a flow conditioner. In fact, Schuessler testified he does not even know the solidity of RJ Machine's flow conditioner. Similarly, Michael Roseborough, the designer of RJ Machine's flow conditioner, testified he is not familiar with the solidity of RJ Machine's flow conditioner.

RJ Machine has apparently sold thousands of flow conditioners since entering the market in 2013 without using the "50E" designation. *See, e.g.*, Def.'s Trial Ex. 27 (order form from RJ Machine customer). RJ Machine produced some of its purchase orders, which came from a number of different customers, and CPA summarized these voluminous records, highlighting the fact that only one time in 238 purchase orders did a customer use the "50E" or "CPA 50E" designation. *See* Def.'s Trial Ex. 44. Instead, RJ Machine's customers have used a variety of other ways to describe the flow conditioner they sought to purchase from RJ Machine. *See id.* When presented with this exhibit, Schuessler did not dispute its accuracy. Schuessler also stated that employees of RJ Machine do not refer internally to their flow conditioner as the "50E."

At some point in 2013, RJ Machine sought to call its flow conditioner the "50E" because, in its view, that term has become standard in the industry for this particular type of flow conditioner and is what consumers now call this particular type of flow conditioner. While not entirely clear, one of the reasons why RJ Machine arrived at this conclusion was the specification forms filled out by customers specifically requiring a "CPA 50E" or "50E" flow conditioner. In RJ Machine's view, it produced a similar, if not identical, flow conditioner and at half the price. As such, RJ Machine wanted to call its flow conditioner "50E" in order to be covered by the specification form requests and compete with CPA's 50E.

## V.      Current Lawsuit and Procedural History

## A.      Pre-Suit Activity

While RJ Machine wanted to start calling its flow conditioner "50E," it was also aware of CPA's opposition to any entrants into the market who were using its trademarks. Specifically, CPA had previously filed a trademark infringement lawsuit against a company called Canalta Controls Ltd. (Canalta), which had apparently tried to market and sell a flow conditioner similar in design to the CPA 50E and called it the "Contour 50F." The parties eventually settled, and Canalta now sells its flow conditioner with the name "Contour K5."

RJ Machine, wanting to enter the market like Canalta but not wanting to be sued, approached CPA, seeking assurances CPA would not try to prevent RJ Machine from marketing flow conditioners using the 50E design and designation. RJ Machine presented CPA's counsel with proposed marketing material which compared RJ Machine's product directly with CPA's. *See* Def.'s Trial Exs. 43A–43C. Counsel for CPA responded in a letter indicating CPA would sue RJ Machine

if RJ Machine advertised or marketed its 50E flow conditioners using the same design as CPA's 50E flow conditioner or used the term "50E" to identify its flow conditioner.[5]  Compl. [#1-5] Ex. E.

**B.     The Complaint and the Answer**

On July 10, 2013, RJ Machine filed this lawsuit against CPA, alleging the following four counts: (1) violations of 15 U.S.C. § 2 (Sherman Act); (2) violations of the Texas Free Enterprise and Antitrust Act of 1983; (3) unfair competition and unfair trade practices; and asking for (4) a declaratory judgment. *Id.* [#1] ¶¶ 41–64.  The Court granted CPA's motion to dismiss counts (1)–(3), leaving only the declaratory judgment action. *See* Order of Nov. 22, 2013 [#35].

CPA filed an answer and also asserted a number of counterclaims. *See* Answer & Countercl. [#36].  Subsequently, CPA filed an Amended Answer in which it removed all of its counterclaims. *See* Am. Answer [#77].  Therefore, the only live claim in this case is RJ Machine's declaratory judgment action.  While RJ Machine originally sought a variety of declarations, *see* Compl. [#1] at 9–11, the only remaining disputed issue in the case, distilled to its core, is whether CPA has legally protectable trademarks in "CPA 50E" and "50E."

**C.     CPA's Motion for Summary Judgment**

After the close of discovery, CPA filed a motion for summary judgment, laying out its theory of the case.  CPA's basic argument is that it has used its trademarks for over fifteen years and, before expiration of the Laws Patent, developed customer recognition of CPA's brand name.  Mot. Summ. J. [#79] at 1.  According to CPA, to allow RJ Machine to call its imitation flow conditioner "50E"

---

[5] In addition to opposing RJ Machine's use of its marks, CPA also originally opposed RJ Machine's use of the same design as the CPA 50E and threatened trade dress enforcement.  Indeed, CPA asserted trade dress counterclaims.  CPA, however, has since withdrawn those claims and agreed in its briefing and at trial that RJ Machine is free to manufacture a flow conditioner with the same design as the NOVA 50E.

would rob CPA of benefits earned by fifteen years of promotion and marketing, would confuse customers, and would deprive customers of the ability to associate the well-known "50E" trademark with its recognized source: CPA. *Id.* CPA argues its trademarks do not qualify as "generic" or "descriptive without secondary meaning." Instead, CPA contends its marks are distinctive to CPA because CPA, and CPA alone, has spent time and resources selling flow conditioners under the "50E" brand, creating a significance in the mind of relevant consumers to associate the "50E" marks with flow conditioners sold by CPA. *Id.* The two trademarks at issue were unopposed, creating a presumption of validity (a presumption that, as to "CPA 50E," is incontestable because it was sold in the market for five years post-registration). *Id.* CPA argues these marks are fanciful and do not describe or refer generally to flow conditioners. *Id.*

RJ Machine responds that CPA is attempting to exploit fraudulently acquired trademarks in order to prevent RJ Machine from competing in the market. Resp. [#81] at 1. According to RJ Machine, the name "50E," rather than being a source identifier for CPA, is actually the name for a particular type of flow conditioner with a specific set of technical characteristics. *Id.* at 2. RJ Machine contends the fact "50E" describes a type of flow conditioner means the mark is generic and not distinctive to CPA. *Id.* at 2. To combat CPA's assertion of presumptions of validity of its trademarks, RJ Machine argues CPA made material misrepresentations to the PTO in applying for its marks, and if CPA disclosed the information it should have, the PTO would not have registered the marks. Finally, RJ Machine argues the validity of a trademark can come into question post-registration if there is a lack of quality control in the manufacturing, which results in an inconsistent product. *Id.* RJ Machine contends CPA has failed to exercise quality control over its 50E flow

conditioners. As a result, RJ Machine argues CPA's registered trademarks have ceased to function as trademarks and have become generic. *Id.*

On March 31, 2015, the Court denied CPA's motion for summary judgment, finding the parties' competing evidence created fact issues concerning the distinctiveness of CPA's marks and the related question of secondary meaning. *See* Order of Mar. 31, 2015 [#107] at 18. The Court also identified fact issues with respect to RJ Machine's fraud-on-the-PTO and quality control arguments. *Id.* at 18–20. All that remained in the case was resolution of these disputed fact questions on a full trial record.

## D.      The Exclusion of Industry Witnesses

Prior to the bench trial, CPA moved to exclude six of RJ Machine's fact witnesses who are flow conditioner industry participants proffered to testify concerning the meaning of "CPA 50E" and "50E" in the relevant marketplace. RJ Machine previously submitted affidavits of these six individuals in responding to CPA's motion for summary judgment, and CPA moved to strike them. The Court denied the motion to strike and considered the affidavits as part of the summary judgment record. *See id.* at 20–23. The Court, however, made clear it would not necessarily permit these witnesses to testify at trial if they were not timely disclosed as indicated by CPA. *Id.* at 23. Indeed, the Court subsequently granted CPA's motion to exclude these witnesses from testifying at trial because RJ Machine had failed to disclose them in compliance with deadlines agreed to by the parties themselves (after numerous agreed extensions). *See* Order of Apr. 17, 2015 [#113].[6]

---

[6] In its order, the Court explained in detail the multiple agreed scheduling order extensions the parties sought and received for the witness disclosure and discovery deadlines. *See* Order of Apr. 17, 2015 [#113] at 2. Notwithstanding these extensions, RJ Machine still failed to comply with its own deadlines to disclose witnesses and failed to offer any good reason for its tardiness. *Id.* at 2–3. The Court further explained that to allow RJ Machine's witnesses would either result in prejudice to CPA if the case proceeded to trial as scheduled or a continuance to early 2017, the earliest date this Court's busy docket would permit. *Id.* at 4.

**Conclusions of Law**

## I.     Legally Protectable Trademarks

Trademark infringement is governed by the Trademark Act of 1946 (the Lanham Act), 15

U.S.C. §§ 1051 *et seq.*  The Lanham Act defines a "trademark" as:

> any word, name, symbol, or device, or any combination thereof . . . used by a person
> . . . to identify and distinguish his or her goods [or services] . . . from those
> manufactured or sold [or provided] by others and to indicate the source of the goods
> [or services], even if that source is unknown.

15 U.S.C. § 1127.

There are two elements to a successful infringement claim under the Lanham Act.  The

plaintiff must first "establish ownership in a legally protectible mark, and second, . . . show

infringement by a demonstrating a likelihood of confusion."  *Amazing Spaces, Inc. v. Metro Mini*

*Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010) (citations omitted).  The instant case does not involve

the typical scenario where a plaintiff trademark holder sues an alleged infringer.  Instead it involves

a declaratory judgment in which the plaintiff, who is the potential infringer, seeks to show the

defendant's registered trademarks "50E" and "CPA 50E" are invalid.  If the marks are invalid, then

the plaintiff's use of the marks does not amount to infringement.  Therefore, the only issue in the

present case is the threshold question of whether CPA's marks are legally protectable.

"To be protectable, a mark must be distinctive . . . ."  *Id.* at 237 (citations omitted).  The

Supreme Court has explained a mark can be distinctive by either (1) being inherently distinctive

because the mark's "intrinsic nature serves to identify a particular source," or (2) having acquired

distinctiveness if it has developed secondary meaning, which occurs when, "in the minds of the

public, the primary significance of a [mark] is to identify the source of the product rather than the

product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000) (citations omitted).

## II.    Application

## A.    Effect of Registration

Before examining the distinctiveness of CPA's marks, the Court first addresses the effect of CPA's registrations with the PTO.  "Proof of the registration of a mark with the PTO constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services." *Amazing Spaces*, 608 F.3d at 237; 15 U.S.C. §§ 1057(b) & 1115(a).  Commercial use of a mark for more than five years post-registration makes the mark "incontestable," and the mark can only be cancelled if: "(1) the mark has become generic; (2) the mark was abandoned; (3) the registration was obtained fraudulently; or, (4) the mark was used to misrepresent the source of the goods or services." *Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 125 (5th Cir. 1993) (citing 15 U.S.C. §§ 1064, 1065; *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 197 (1985); *Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1326 (Fed. Cir. 1983)).  If the mark has not yet attained "incontestable" status, it still benefits from a presumption of validity.  This presumption, however, may be rebutted by establishing the mark is not inherently distinctive.  *Amazing Spaces*, 608 F.3d at 237 (citing *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979) ("[The] presumption is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark.").

In this case, CPA registered its "CPA 50E" mark in 2005 and has since obtained from the PTO a certificate of incontestability.  RJ Machine challenges the validity of the incontestable mark,

however, based on two permissible grounds: (1) the mark has become generic, and (2) the registration was obtained fraudulently.

Regarding CPA's "50E" mark registered in 2011, it is not incontestable, but the Court presumes its validity. RJ Machine may rebut this presumption by establishing that "50E" is generic or descriptive. If RJ Machine does so, it will have "reduced the presumption of validity to evidence that the PTO is of the opinion that the ["50E" mark] is sufficiently distinctive to be legally protectable as a mark." *Amazing Spaces*, 608 F.3d at 239.

**B.     The Distinctiveness of CPA's Marks**

In evaluating the distinctiveness of word marks, "courts have applied the now-classic test originally formulated by Judge Friendly" in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). *Wal-Mart Stores, Inc.*, 529 U.S. at 210–11. In his test, Judge Friendly created categories of marks existing across the distinctiveness spectrum. The Fifth Circuit has summarized the *Abercrombie* categories as follows:

> A *generic* term is the name of a particular genus or class of which an individual article or service is but a member. A generic term connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product. Generic terms can never attain trademark protection. Furthermore, if at any time a registered trademark becomes generic as to a particular product or service, the mark's registration is subject to cancellation. Such terms as aspirin and cellophane have been held generic and therefore unprotectable as trademarks.

> A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients. Descriptive terms ordinarily are not protectable as trademarks; they may become valid marks, however, by acquiring secondary meaning in the minds of the consuming public. Examples of descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services. As this court has often noted, the distinction between descriptive and generic terms is one of degree. The distinction has important practical consequences,

however; while a descriptive term may be elevated to trademark status with proof of secondary meaning, a generic term may never achieve trademark protection.

A *suggestive* term suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods or services. A suggestive mark is protected without necessity of proof of secondary meaning. The term "Coppertone" has been held suggestive in regard to sun tanning products.

*Arbitrary* or *fanciful* terms bear no relationship to the products or services to which they are applied. Like suggestive terms, arbitrary and fanciful marks are protectable without proof of secondary meaning. The term "Kodak" is properly classified as a fanciful term for photographic supplies. "Ivory" is an arbitrary term as applied to soap.

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790–91 (5th Cir. 1983) (citations and quotation marks omitted), *abrogated on other grounds by KB Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 (2004). As indicated, suggestive, arbitrary, and fanciful marks are inherently distinctive. Descriptive marks are not inherently distinctive but may acquire distinctiveness through secondary meaning. Finally, a generic mark is never distinctive.

In categorizing a term, courts must examine the context in which the term is used. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 (5th Cir. 2015) (citing *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 847 (5th Cir. 1990)). Court should consider "'how [the term] is used with other words,' 'the products or services to which it is applied,' and 'the *audience* to which the relevant product or service is directed.'" *Id.* (quoting *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921) (Hand, J.)).

1.      **Are the marks generic?**

RJ Machine carries a heavy burden to establish CPA's registered marks are generic. *See Amazing Spaces*, 608 F.3d at 239 ("The presumption of validity flowing from trademark registration

has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is non-distinctive by a preponderance of the evidence."). "Because a finding of genericness may result in the loss of rights which could be valuable intellectual property, a court should not find genericness without persuasive and clear evidence that the contested term has become generic among a majority of the buyer group." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:12 (4th ed., rev. 2015) (MCCARTHY).

"The test for genericness is whether the public perceives the term primarily as the designation of the article." *Nola Spice Designs*, 783 F.3d at 538 (quoting *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs Inc.*, 41 F.3d 223, 227 (5th Cir. 1995) (internal quotation marks, citation, and alterations omitted)). A generic term is the name of the genus or class as compared to the species, which is a grouping within a given genus. *See Zatarains*, 698 F.2d at 790; MCCARTHY § 12:23. "An example of a generic word is 'fish.' 'Fish' is a generic term which applies with equal force to sole, haddock, perch, salmon, bass and carp." *Union Nat. Bank of Tex.*, 909 F.2d at 845. Therefore, the first key question becomes: what is the genus of goods at issue? *See H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986) (breaking the primary significance test into a two-step inquiry: "First, what is the genus of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?").

The parties dispute the genus at issue in the case. RJ Machine argues "CPA 50E refers to a class of goods which contains species within that class." Pl.'s Proposed Findings of Fact and Conclusions of Law [#114] at 5. RJ Machine, however, did not support this contention with

argument or evidence at trial.[6]  Moreover, the facts clearly show "CPA 50E" and "50E" do not refer to a class of goods but instead refer specifically to a flow conditioner made by CPA.  Beyond CPA, there are no members of the class "50E."  A "class" with one member cannot be a genus.[7]  While RJ Machine complains CPA's status as the only manufacturer of the 50E is due to CPA's exclusive license with Statoil, the Court fails to see the relevance of this point.  Trademark law is the focus of this case, and CPA's exclusive license with Statoil, along with its permission from NOVA, simply gave it the right to make a flow conditioner with a certain design.  These agreements did not exclude any company from making a flow conditioner and calling it the "50E."  The relevant point is that CPA, and CPA only, established the "50E" mark in commerce and developed brand recognition.

CPA argues—and the Court agrees—the applicable genus to the facts of this case is "flow conditioner."  Within this genus are species like tube-bundle flow conditioners, vane-style flow conditioners, tabbed flow conditioners, and perforated plate flow conditioners.  Alternatively, the Court finds perforated plate flow conditioners would be the genus for the circumstances of this case.  Within the class of perforated plates, there are a variety of manufacturers and brands, including CPA's 50E, Canalta's Contour K5, Gallagher's Savant, and Emerson's Profiler.  One specification ordered the flow conditioner to be a "CPA or equivalent," suggesting different brands of perforated plates can substitute for one another.  Pl.'s Trial Ex. 48.  CPA's expert, Stephen Stark, who has

---

[6] In its pre-trial briefing, RJ Machine suggested "CPA 50E" was the class, and the species within that class are different types of CPA 50Es that differ based on installation method (e.g., flange vs. pin) or size (e.g., two-inch vs. four-inch).  See Proposed Findings of Fact and Conclusions of Law at 5.  The Court rejects this argument.  First, RJ Machine did not develop this line of argument at trial.  Second, RJ Machine offers no legal authority for the notion that a single product can become a genus simply because the product comes with multiple installation options and in different sizes.

[7] The NOVA 50E does not constitute a member of the alleged "50E" genus for trademark purposes because it was never used as a mark in commerce.  Rather, it was an internal designation within NOVA's research and development project.

extensive experience in the flow conditioner industry, testified that in his opinion, the relevant class was perforated flow conditioners and that in his view the CPA 50E had not been used generically as a class of product.

Having established the relevant genus as "flow conditioner," or alternatively "perforated plate flow conditioner," the next question becomes whether the terms "50E" and "CPA 50E" are understood by the relevant public primarily to refer to the genus "flow conditioner." The answer is "no." As just explained, the 50E is a subset of perforated plate flow conditioners, which is a subset of flow conditioners. "50E" is not the genus for the goods or services in question.

RJ Machine's only argument at trial concerning genericness was that the 50E was "born generic" because of its origins with the NOVA 50E. As an initial matter, the Court is unclear on what it means to be "born generic," a phrase used by RJ Machine in trial and in its briefing with no citation to any legal authority. Furthermore, the Court fails to see how the mark "50E" was born generic with the NOVA 50E when the NOVA 50E was never used as a mark. Prior to 1997, "50E" was simply an internal designation for a prototype researched and developed by Karnik on behalf of NOVA. NOVA has never sold a flow conditioner nor commercialized the NOVA 50E in any manner. The Sawchuks took the initiative to start a business, solicit permission from NOVA to use the NOVA 50E design, obtain a license from Statoil to use the technology from the Laws Patent, manufacture a flow conditioner, and then introduce a "CPA 50E" flow conditioner to the marketplace. Until then, "50E" was not a mark and did not exist as a brand. To suggest "50E" was "born generic" when it was no more than a research project ignores that trademark law concerns the use of marks to identify a seller's goods and distinguish that source from other sources for the benefit

of consumers. *See* 15 U.S.C. § 1127.[8]

In addition, while the record clearly shows that the CPA 50E is similar to, if not identical to, the NOVA 50E and that CPA represented to the consuming public its flow conditioner's close connection to the NOVA 50E as recently as 2012, CPA simply directed customers to the research performed on the NOVA 50E. Any customer who read those papers would not find any information suggesting the NOVA 50E was a flow conditioner manufactured and sold in the market. The only 50E ever available to flow conditioner purchasers has been CPA's, and CPA has policed that mark against other companies like Canalta and RJ Machine when they have tried to use the same or similar mark.

Moreover, while CPA has a history of sending NOVA 50E research materials to customers, representatives from both companies testified they have never discussed with any customer the NOVA research. And because RJ Machine failed to timely disclose its industry witnesses, there was

---

[8] In its pre-trial briefing, RJ Machine recited the following passage—without further discussion—from *Singer Manufacturing Co. v. June Manufacturing Co.*, 163 U.S. 169 (1896), describing a legal theory by which a mark can become generic:

> [W]here, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that or the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created. Where another avails himself of this public dedication to make the machine and use the generic designation, he can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements, and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights, or to deceive the public; and, therefore, that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact.

*Id.* at 199–200. At trial, however, RJ Machine did not develop this legal argument. In fact, in closing argument, counsel for RJ Machine argued to the contrary—without citing any legal authority—that trademarks can be used after a patent expires so long as the trademark applicant was actually the owner of the patent at issue rather than, for example, a patent licensee like CPA. Moreover, RJ Machine did not present any evidence that the consuming public, during the life of the Laws Patent, came to understand "50E" to be the identifying and generic name of the invention disclosed by the Laws Patent. In sum, to the extent RJ Machine asserts the legal proposition offered by *Singer*, RJ Machine failed to develop the theory and failed to support it with evidence.

no direct testimony from any flow conditioner consumers stating they understand "50E" to generically refer to a category of flow conditioners rather than as a CPA brand. The only evidence of consumer perception in the record are: (1) the specifications and customer emails, which, taken together, indicate consumers' association of "50E" with CPA; and (2) the testimony of CPA's expert, Stephen Stark, that "50E" has not been used generically and rather is a brand associated with CPA. Indeed, Schuessler from RJ Machine confirmed this reality by agreeing flow conditioner customers associate "50E" with CPA.

In sum, RJ Machine fails to meet its burden to establish the marks "CPA 50E" and "50E" are generic.

### 2.    Are the marks descriptive?

RJ Machine argues, if the "50E" mark is not generic, then it is descriptive without secondary meaning.[9] Again, RJ Machine bears the burden to rebut the presumption of validity of the "50E" mark and establish its descriptive nature. "When a word or phrase conveys an immediate idea of the qualities, characteristics, effect, purpose, or ingredients of a product or service, it is classified as descriptive . . . ." *Zatarains*, 698 F.2d at 792. In *Zatarains*, the Fifth Circuit discussed a number of tests for courts to apply to the descriptiveness inquiry: (1) the dictionary definitions of the words; (2) whether imagination or thought is required to understand what the mark describes; (3) whether other producers require the term to describe their product; and (4) the extent to which others actually use the term in marketing a similar service or product. *Id.* at 792–93. The Court addresses each test.

First, there is no evidence in the record of any dictionary definitions of "50E." Second, the

---

[9] As explained above, due to the incontestability of "CPA 50E," RJ Machine cannot challenge that mark on the ground it is descriptive. In comparison, RJ Machine can challenge "50E," which is not incontestable, by establishing its descriptive nature.

imagination test "seeks to measure the relationship between the actual words of the mark and the product to which they are applied." *Id.* at 792. "If a term requires imagination, thought and perception to reach a conclusion as to the nature of goods, it is considered a suggestive term." *Id.* (internal quotation omitted). "Alternatively, a term is descriptive if standing alone it conveys information as to the characteristics of the product." *Id.* Here, the record shows Dr. Umesh Karnik created the NOVA 50E, and the "50" referred to the plate's 50% solidity. Blaine Sawchuk knew the "50" signified 50% solidity, and he modeled the CPA 50E on the NOVA 50E. In that sense, the Court sees how "50" describes the flow conditioner at issue. The focus of trademark law, however, is consumer perception, and the evidence at trial indicated solidity is not an important factor to either flow conditioner manufacturers or consumers. For instance, while CPA sent its Promotional Package and other NOVA-based research materials to consumers, CPA's representatives all testified they do not discuss the solidity of their plate with potential customers. Their expert, Stephen Stark, also confirmed solidity is not a factor that is important to him in selecting flow conditioners. RJ Machine's witnesses agreed. Schuessler testified he had never discussed solidity with a customer, and Roseborough, the designer of RJ Machine's flow conditioner, testified he was not even familiar with the solidity of the RJ Machine flow conditioner. The specifications and customer emails contain no mentions of solidity whatsoever. Considering this evidence, the Court finds that a flow conditioner customer confronting the "50E" mark would not immediately understand that "50" refers to 50% solidity and instead would need to exercise imagination, thought, and perception to reach that conclusion.

Turning to the second part of the mark, the "E" is even less descriptive than "50." According to Karnik's research, the "E" was one of many different models: the NOVA 50A, NOVA 50B,

NOVA 50C, NOVA 50D, NOVA 50F, and NOVA 50G. Each had the 1-8-16 Design, and they differed in the diameter of the holes. The "E" does not describe this design and instead is an arbitrary designation for the fifth in a series of research prototypes. Moreover, as previously stated, the record indicates flow conditioner customers are not generally familiar with the NOVA research and would not understand the significance of "E" in "50E" without carefully consulting those materials. For example, Stephen Stark, an expert in the field, testified he is unfamiliar with the meaning of "E" as it relates to hole configuration.

Finally, the Court has considered the component parts of "50E" separately merely to show that neither is descriptive. Considering the mark as a whole, however, is the approach courts should take in analyzing its descriptiveness. *See Union Nat'l Bank*, 909 F.2d at 848 n.25 ("'The commercial impression of trade-mark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety . . . .'") (quoting *Estate of P.D. Beckwith v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1919)). If neither "50" nor "E" are descriptive, "50E" is only less so.

A third test is whether producers of flow conditioners, or even producers of perforated plate flow conditioners, need to use "50E" as a descriptor. The evidence demonstrates they do not. "A descriptive term generally relates so closely and directly to a product or service that other merchants marketing similar goods would find the term useful in identifying their own goods." *Zatarains*, 698 F.2d at 793 (citing *Vision Center*, 596 F.2d at 116–17). There are many other flow conditioner manufacturers who use a variety of different descriptors and brands to label their respective products. Within perforated plate flow conditioner manufacturers alone, competitors use different brands to describe their product like Gallagher's Savant, Emerson's Profiler, and Canalta's Contour K5. Even

-27-

Canalta, which apparently makes an imitation CPA 50E and had wanted to call it the "Contour 50F," decided it could sells its flow conditioner by calling it the Contour K5, albeit after CPA sued it for trademark infringement. The record also shows RJ Machine customers have successfully ordered (and RJ Machine has sold) thousands of RJ Machine flow conditioners using terms other than "50E" since RJ Machine entered the market in 2013, indicating RJ Machine does not need to call its flow conditioner the "50E." The evidence shows "50E" has only been used to refer to CPA's flow conditioner, and there is no evidence indicating competitors need to call their flow conditioner the "50E" in order to identify them.[10]

Fourth, the Court considers "the extent to which a term actually has been used by others marketing a similar service or product." *Zatarains*, 698 F2d at 793 (citing *Vision Center*, 596 F.2d at 117). CPA is the only manufacturer to have ever used the term "50E" both from 1995 when Karnik wrote the first research paper on the NOVA 50E and from 1999 when CPA introduced "50E" into the marketplace. After approximately fifteen years of exclusive use, Canalta tried to label its flow conditioner the "Contour 50F," and CPA took action to protect its rights. Now RJ Machine is attempting to use the "50E" mark, and again CPA is enforcing its trademark rights.

---

[10] The Court notes competitors like RJ Machine are free to make a flow conditioner modeled after the NOVA 50E, to advertise their flow conditioner is just like the NOVA 50E, to advertise their flow conditioner's solidity as 50%, and to advertise the NOVA research explaining the significance of "E." Competitors, however, do not need to call their flow conditioner "50E" in order to convey any of that information. In fact, Canalta, which sells a flow conditioner based on the NOVA 50E but calls it the "Contour K5," put together promotional documents that explain in detail the history and meaning of the NOVA 50E and the Laws Patent. *See* Pl.'s Trial Ex. 63 at 4. Canalta's materials even acknowledge CPA's role in generating "broad acceptance" of the NOVA 50E design and helping it "become a veritable industry standard for isolating flow meters of several types from upstream piping disturbances." *Id.* Finally, Canalta explains that given the success of the NOVA 50E design and the expiration of the Laws Patent, it "decided to bring the NOVA-50E design into our lineup of OEM flow measure products under the Contour Flow Conditioning Solutions Imprint." *Id.* RJ Machine is free to take similar action.

In sum, RJ Machine has failed to rebut the presumption of validity of "50E" by establishing it as a descriptive mark.[11]

### 3.    Alternatively, "50E" has secondary meaning

Even if "50E" were a descriptive mark, CPA has shown secondary meaning. "Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 (5th Cir. 2015) (citing *Amazing Spaces*, 608 F.3d at 247) (internal quotation marks and citation omitted)). "In other words, 'the mark must denote to the consumer a single thing coming from a single source to support a finding of secondary meaning.'" *Id.* (quoting *Zatarains*, 698 F.2d at 795 (internal quotation marks and citation omitted)). CPA bears the burden of establishing secondary meaning, and the burden "'is substantial and requires a high degree of proof.'" *Id.* at 543–44 (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005)). The determination of secondary meaning is "primarily an empirical inquiry," informed by the following factors:

> (1) the length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress [or mark].

*Id.* (quoting *Amazing Spaces*, 608 F.3d at 247) (internal quotation marks and citation omitted)).

---

[11] The disposition of this lawsuit calls for the Court to determine whether RJ Machine has met its burden to show the registered marks at issue are not legally protectable. In analyzing the issues, the Court has simply described what the marks are not (i.e., generic or descriptive), as determining where on the distinctiveness spectrum the marks actually fall is not necessary to resolve this case. Nevertheless, the Court notes that if such determination were necessary, the record supports a finding that the marks are some combination of suggestive and arbitrary, the salient point being they fall into the "inherently distinctive" category of marks.

Applying these factors to the present case, CPA has exclusively used the marks since 1999. While there is no direct evidence of CPA's volume of sales, Dale Sawchuk testified CPA annually spends between $400,000 and $600,000 on marketing, which is a significant portion of CPA's annual revenues, indicating annual sales in the millions of dollars.  Relatedly, CPA has spent millions of dollars on advertising over the last fifteen years and done so through a variety of channels, including direct communications through mail, email, phone, and personal meetings; attendance at trade shows, courses, and seminars; promotional brochures; presenting papers at industry conferences; and a website.

Regarding the fourth and fifth factors, there is no evidence.  As for direct consumer testimony, there is little evidence as the Court excluded the industry witnesses due to RJ Machine's failure to timely disclose them.  CPA's expert, Stephen Stark, who has been involved in the flow conditioner industry since 1977, frequently consulted companies on flow conditioner issues, and published many articles on flow measurement, testified that he recognizes "50E" as a brand associated with CPA and that "50E" has not been used generically to describe the flow conditioner itself.

Finally, RJ Machine's intent in using the "50E" mark appears to reflect a desire to take advantage of customer specifications requiring a "50E" or its equivalent.  This is potentially problematic because the evidence suggests the RJ Machine flow conditioner is not identical to the CPA 50E.  For instance, RJ Machine's flow conditioner designer testified he compared the RJ Machine product to the CPA 50E but did not copy it.  Considering customers have only encountered "50E" as a CPA product, customers who recognize the "50E" and seek to purchase it for its association with CPA may not be getting the flow conditioner they thought they were getting if RJ

Machine can also brand its flow conditioner as a "50E." Furthermore, "[t]he *need* to use a term because it is generic or highly descriptive should be distinguished from the *desire* to use it because it is attractive." *Union Nat. Bank*, 909 F.2d at 848 n.22.

In the alternative, the Court concludes CPA has satisfied its burden to show "50E" has acquired secondary meaning in the flow conditioner marketplace.

## C.     Fraud on the PTO

Regardless of the distinctiveness of CPA's marks, RJ Machine contends the marks should be cancelled because they were obtained fraudulently. CPA registered the "CPA 50E" mark in 2005 and the "50E" mark in 2011. While the "CPA 50E" has obtained incontestable status, RJ Machine can still challenge such a mark on the ground of fraudulent procurement. "To seek cancellation, a plaintiff must prove (1) a false representation, (2) regarding a material fact, (3) the registrant's knowledge or belief that the representation is false, (4) the intent to induce reliance on the misrepresentation, (5) reasonable reliance, and (6) damages proximately resulting from the reliance." *Burnscraft Mfg. Corp. v. Nat'l Constr. Rentals, Inc.*, No. H-13-2769, 2014 WL 1386300, at *4 (S.D. Tex. Apr. 9, 2014) (Rosenthal, J.) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)). "To succeed on a claim of fraudulent registration, the challenging party must prove by clear and convincing evidence that the applicant made false statements with the intent to deceive the licensing authorities." *Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 126 (5th Cir. 1993). A plaintiff bears a heavy burden to prove fraud. *Burnscraft*, 2014 WL 1386300 at *4 (citing *Robi*, 918 F.2d at 1439; *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 644 (N.D. Tex. 2009)). "'Because the trademark application oath is phrased in terms of a subjective belief, it is extremely difficult to prove fraud so long as the signer has an honestly held, good faith

-31-

belief that it is the senior right holder.'" *Id.* (quoting *Hana Fin., Inc. v. Hana Bank*, 500 F. Supp. 2d 1228, 1235 (C.D. Cal. 2007)).

According to RJ Machine, Blaine Sawchuk made a false declaration in support of CPA's 2009 application for the "50E" mark. Notably, RJ Machine has not provided any affidavit from the 2005 "CPA 50E" application or provided any evidence of a statement by CPA, false or otherwise, in connection with the 2005 application. For that reason alone, the challenge to the "CPA 50E" mark fails. Regardless, even if Blaine Sawchuk made a similar declaration in support of the "CPA 50E" mark as he did with the "50E" mark, the fraud claim has no merit for reasons discussed below.

Blaine Sawchuk made the following pertinent representations to the PTO in the 2009 application: he swore he believed that (1) CPA was the owner of the "50E" trademark sought to be registered, (2) the mark was in use in commerce, (3) CPA was entitled to use the mark in commerce, and (4) to the best of his knowledge and belief, no other company had the right to use the mark in commerce. None of these statements are false. CPA was the first to use "50E" as a mark in commerce, and as of the application dates, no other company had even tried to use the "50E" mark for a flow conditioner. RJ Machine argues the statements in the affidavit were false because NOVA and/or Statoil actually owned the technology underlying CPA's 50E, and CPA only obtained a license to that technology. *See* Pl.'s Trial Br. [#126] at 6. According to RJ Machine, CPA "falsely claimed that it owned as a trademark the *name* of that technology, the '50E.'" *Id.* RJ Machine's argument is wrong and built on faulty premises that fail to appreciate the differences between the rights CPA acquired through the NOVA Permission Letter and the Statoil/CPA License Agreement as compared to trademark rights in the "50E" mark.

Pursuant to the NOVA Permission Letter, CPA simply obtained the right to manufacture and

sell the flow conditioner developed by NOVA. NOVA explicitly conditioned its permission on CPA agreeing not to name its product "the NOVA Flow Conditioner, or after NOVA in any other way," but NOVA said nothing about CPA's use of "50E." Under the Statoil/CPA License Agreement, CPA obtained the right to use the flow conditioner design disclosed by the Laws Patent. CPA, however, did not obtain any rights to the underlying TECHNOLOGY, defined as "any and all technical information related to the K-Lab Laws Flow Conditioners as claimed in the PATENTS [i.e., the Laws Patent] and as described in TECHNICAL INFORMATION [i.e., the K-Lab Design Manual]." Notably absent from either of these agreements is any mention of trademark rights. In fact, as of the time of execution of these agreements, CPA had yet even to brand its flow conditioner the "CPA 50E" and use the mark in commerce. Similarly, neither NOVA nor Statoil owned any trademark rights in "50E" as neither ever manufactured or sold a flow conditioner, much less a flow conditioner labeled with the "50E" mark. As such, neither party could convey or withhold any trademark rights in "50E" at all.

Blaine Sawchuk's representations to the PTO regarding CPA's ownership of the "50E" mark were accurate, and RJ Machine fails to establish even the first element—a false statement—of its fraudulent misrepresentations claim. Even if Blaine Sawchuk's statements were somehow false, the Court notes RJ Machine fails to present evidence on any of the other elements.[12] In sum, RJ

---

[12] For example, there is no evidence of materiality as RJ Machine offers no more than the conclusory assertion that the PTO would not have registered the marks if not for Blaine Sawchuk's allegedly false statements in his declaration. Additionally, there is no evidence Blaine Sawchuk made the supposedly false statements knowing they were false or with the intent to induce reliance on those misrepresentations. Finally, RJ Machine presented no evidence of damages resulting from the PTO's reliance.

Machine's fraudulent misrepresentation claims are baseless.[13]

## D.    Quality Control

One final argument asserted by RJ Machine is that CPA fails to adequately control the quality of its products, and as a result, the marks "50E" and "CPA 50E" are generic.  *See* Pl.'s Proposed Findings of Fact and Conclusions of Law [#114] at 9–10.  The contention is lacking both legally and factually.  First, RJ Machine cites no legal authority linking quality control to the validity of an unlicensed trademark.  To the extent RJ Machine cites any legal authority, it is irrelevant to the current circumstances.[14]

Second, RJ Machine failed to develop its quality control theory with evidence at trial.  The only witness RJ Machine even questioned regarding quality control was Dale Sawchuk who explained briefly some of the quality control procedures that do exist at CPA.  Blaine Sawchuk also provided a short bit of testimony explaining how upon arrival from one of CPA's four third-party manufacturers, the flow conditioners are quarantined and inspected against the original drawings to ensure consistent quality and how CPA maintains hard copy records of their inspection sheets.  The

---

[13] As a corollary to its fraudulent misrepresentation claim, RJ Machine also contends CPA fraudulently omitted material information when it did not disclose to the PTO the NOVA 50E origins of the CPA 50E in the form of, for example, the 1995 Karnik Paper. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law [#114] at 8. RJ Machine fails to provide any legal authority for its fraudulent omission theory or for the idea that CPA needed to disclose the CPA 50E's technical background as part of its trademark application.  Trademark law concerns the use of marks in commerce; the NOVA 50E was an internal research project that never entered the flow of commerce.  Indeed, in the NOVA Permission Letter, NOVA expressed how happy it was to grant CPA permission to make and sell a flow conditioner based on the NOVA 50E and its appreciation for the work CPA was doing to establish the NOVA-developed flow conditioner in the commercial industry.

[14] CPA has effectively analyzed and distinguished the authorities and cases cited by RJ Machine. *See* Def.'s Trial Br. on Irrelevance of Quality Control [#124] at 1 n.1 (identifying authorities cited by RJ Machine in Pl.'s Proposed Findings of Fact and Conclusions of Law [#114] at 9–10 and explaining why they all stand for the proposition that quality control is irrelevant absent a license or assignment in gross).  CPA has also persuasively explained how quality control is generally the right of the trademark holder and only becomes relevant if (1) the trademark holder assigns the mark "in gross" or (2) conveys a "naked license" by licensing use of the mark but failing to exercise even minimal control over the license. *See id.* at 2–4.  Since CPA has done neither with respect to its marks, quality control is immaterial. *See id.* at 4.

Sawchuks' testimony alone established in the record at least a minimum level of quality control. *See Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977) (explaining that even in the situation where a trademark holder licenses its mark, "[r]etention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market"). Outside of this limited testimony, there is no evidence in the record even discussing quality control, and RJ Machine did not even raise the issue in closing argument.

### Conclusion

CPA has registered trademarks in the word marks "CPA 50E" and "50E." CPA is the only company to have ever used these marks in commerce to describe a flow conditioner and has done so for the last fifteen years while building a successful company from the ground up and establishing a strong reputation with customers in the flow conditioner industry. RJ Machine carries the burden to rebut the presumptions of validity that attach to these marks with registration, and RJ Machine has failed to show that "CPA 50E" is generic or that "50E" is either generic or descriptive. Moreover, RJ Machine's arguments regarding fraud on the PTO and quality control have no support.

Therefore, the Court finds RJ Machine is not entitled to any of the declarations and relief it seeks pursuant to its declaratory judgment action. *See* Compl. [#1] at 9–11. In particular, the Court denies RJ Machine's request that the Court, pursuant to 15 U.S.C. § 1119, cancel the "50E" mark and order the PTO to enter a disclaimer of "50E" in the mark "CPA 50E." *See* Pl.'s Proposed Findings of Fact and Conclusions of Law [#114] at 10. RJ Machine can model its flow conditioner after the NOVA 50E, it can manufacture a flow conditioner that imitates the CPA 50E, and it can

advertise its flow conditioner's technical characteristics and NOVA 50E origins.  RJ Machine, however, cannot call its flow conditioner a "50E."

Accordingly,

IT IS ORDERED that Plaintiff RJ Machine Company, Inc. is not entitled to any of the declarations or relief requested in its Complaint [#1].

SIGNED this the _15th_ day of July 2015.

_Sam Sparks_
SAM SPARKS
UNITED STATES DISTRICT JUDGE